**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANGELA N. BRYANT, Ph.D.,** | ) | **Case No. 2:22-cv-1966** |
| | ) | |
| **Plaintiff,** | ) | **Judge** _____ |
| | ) | |
| v. | ) | **Magistrate Judge** _____ |
| | ) | |
| **OHIO STATE UNIVERSITY,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **KRISTINA M. JOHNSON, President of the** | ) | |
| **Ohio State University, in her official capacity,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MELISSA L. GILLIAM, Executive Vice** | ) | |
| **President and Provost of the Ohio State** | ) | |
| **University, in her official capacity,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **WILLIAM L. MacDONALD, Dean and** | ) | |
| **Director of the Ohio State University at Newark,** | ) | |
| **in his official capacity,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **KRISTI WILLIAMS, Chair of the Ohio State** | ) | |
| **University Department of Sociology,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT WITH JURY DEMAND ENDORSED HEREON**

## I. INTRODUCTION

1.     Angela N. Bryant, Ph.D., brings this lawsuit for prospective injunctive and

declaratory relief, damages, attorneys' fees, and costs on her behalf, pursuant to the

Rehabilitation Act of 1973, Section 504, 29 U.S.C. § 794, *et seq.*, the Americans with

1

Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended, and the Family Medical Leave

Act, 29 U.S.C. § 2601, *et seq.*, against Defendant Ohio State University, and, pursuant to the

case of *ex parte Young*, against Ohio State University's president, executive vice president and

provost, the dean of its Newark campus, and the chair of sociology campus, in their official

capacities.

2.     Defendant Ohio State University and its then officers violated the rights of Dr.

Bryant, a tenured associate professor of Sociology at Ohio State's Newark campus, when they

denied Dr. Bryant medical leave they knew she was in need of and failed to accommodate her

known mental health disabilities of bipolar disorder and post-traumatic stress disorder.

Specifically, in the fall of 2020, Dr. Bryant requested leave and disability accommodations

because she was experiencing a mental health crisis.  Her supervisors and Ohio State's human

resources representatives were aware Dr. Bryant was not capable of communicating clearly

regarding her need for leave and other accommodations, but refused to approve her leave unless

she personally approved the submission of specific documentation.

3.     After weeks of back and forth regarding this documentation, Dr. Bryant's

condition worsened and she was repeatedly involuntarily hospitalized.  In November 2020, Dr.

Bryant was ordered to be hospitalized by the probate court based on verification by medical

professionals that she was not capable of caring for herself.  However, as this court-ordered

hospitalization was taking effect, Dr. Bryant sent an unsigned, profanity-laced email

communication purporting to resign her employment.  Rather than inquiring into Dr. Bryant's

well-being or taking into account the many forms of communication from Dr. Bryant's

colleagues and family informing them of her deteriorating mental condition, Dr. Bryant's

supervisors and Ohio State University's human resources and legal counsel decided to take the

purported resignation at face value, and then refused to allow Dr. Bryant to rescind it when, prior to the effective date of the resignation, she regained lucidity, explained the mental health reason for her email, and asked to return to work.  Since that time, the University has denied Dr. Bryant the benefit of the appeal processes ordinarily available to tenured faculty and excluded her from her employment.

## II.     JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).  This action combines claims for relief against Ohio State University under the Rehabilitation Act of 1973 and *ex parte Young* claims for injunctive and ancillary relief against individual state officers in their official capacities, both of which are outside the scope of immunity afforded to the State of Ohio by the Eleventh Amendment to the U.S. Constitution.

5.      Compensatory damages are sought against Defendant Ohio State University pursuant to Section 504 of the Rehabilitation Act of 1973.

6.      Declaratory and prospective injunctive relief is sought pursuant to *ex parte Young,* the Americans with Disabilities Act, and the Family Medical Leave Act.

7.      Costs and attorneys' fees may be awarded pursuant to all of the causes of action listed above, including as ancillary relief pursuant to *ex parte Young*.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the discriminatory and retaliatory acts were and are now being committed in and around Franklin and Licking Counties, which are both within the jurisdiction of the U.S. District Court for the Southern District of Ohio, Eastern Division.

### III.   PARTIES

9.      Plaintiff Angela N. Bryant, Ph.D., is a resident of Westerville, Ohio, in Franklin County, which is in the Southern District of Ohio, Eastern Division.

10.     Defendant Ohio State University ("OSU" or "the University"), which is a public university, a political subdivision of the State of Ohio, and a program receiving substantial federal financial assistance.  As such, it is a "program or activity" for purposes of multiple subdivisions of Section 504(b) of the Rehabilitation Act.

11.     Defendant Kristina M. Johnson is OSU's president, and as such, its chief executive officer and the head of its administration.  Defendant Melissa L. Gilliam is OSU's Executive Vice President and Provost, and its chief academic officer.  Defendant William L. MacDonald is the Director and Dean of OSU's Newark campus, with primary authority for the administration of that campus and its faculty.  Defendant Kristi Williams is the present chair of OSU's Department of Sociology, the academic department in which Dr. Bryant was employed. Collectively, these four officials of the State of Ohio hold the authority to effect prospective relief for the Plaintiffs regarding all employment matters.  They are sued in their official capacities only, without relation to any personal role they played in Dr. Bryant's employment. The Plaintiff does not allege that Defendant Williams in particular has played any role in the denial of employment, medical leave, or disability accommodations to Dr. Bryant.

### IV.   FACTS

*Dr. Bryant's Employment at the Ohio State University.*

12.     Plaintiff Angela Bryant ("Dr. Bryant") received her Ph.D. in Sociology at Arizona State University in August 2007.

13.     In September 2007, Dr. Bryant was hired as an assistant professor, on the tenure track, at OSU's Newark campus ("OSU-Newark"), in OSU's Department of Sociology, pursuant to an employment contract that incorporated OSU's University Faculty Rules, which are codified at Chapter 3335 of the Ohio Administrative Code and govern the granting of tenure and the rights afforded to faculty when tenure has been granted.

14.     Over the subsequent 13 years, Dr. Bryant performed her duties as a member of OSU and OSU-Newark's faculty with great success.  She received favorable performance reviews throughout her employment and excelled in teaching, research, and service—the three core performance areas in which OSU faculty are judged.

15.     In addition to the traditional functions of her role as a sociology professor—teaching OSU-Newark students and engaging in and publishing the results of her sociological research, Dr. Bryant helped found and coordinate a program called "Inside-Out," in which she would collaborate with the Ohio Department of Rehabilitation and Correction to bring OSU students into correctional facilities to work with incarcerated individuals, and to assist those individuals in obtaining educational services from OSU.  The program was extremely successful and generated both acclaim within the university and productive research opportunities for Dr. Bryant and other faculty members within and outside her department.

16.     In 2016, Dr. Bryant's excellent performance was recognized through her promotion to the rank of associate professor with tenure.  This afforded her not only recognition as a tenured faculty member, but also additional contractual rights, including, pursuant to OSU's University Faculty Rule 3335-5-03, the promise of permanent, continued employment, with limited exceptions.  Rule 3335-5-03(D) states, "Tenure is lost only by formal resignation, by voluntary reduction of appointment below fifty per cent of service to the university except in the

5

case of an approved leave of absence, by retirement, by transfer to clinical/teaching/practice, research, or associated faculty status, or may be terminated by reason of proved incompetence or grave misconduct in accordance with rule 3335-5-04 of the Administrative Code, for causes set forth in rule 3335-5-02 of the Administrative Code, or under the conditions of bona fide financial exigency, as specified in rule 3335-5-02.1 of the Administrative Code."

17.     Even after obtaining this guarantee of continued employment, Dr. Bryant continued to excel, and received stellar performance evaluations between 2016 and 2019, recognizing that she was exceeding and even "greatly exceeding" the University's expectations in research, teaching, and service.

*Dr. Bryant Experiences the Onset of Severe Mental Illness*

18.     In late 2019, Dr. Bryant began experiencing progressively more serious symptoms of severe mental illness, which ultimately resulted in her diagnosis with two serious conditions: bipolar disorder and post-traumatic stress disorder (PTSD).

19.     Both bipolar disorder and PTSD, as they manifested in Dr. Bryant, and particularly prior to her receiving treatment for them, interfered with her ability to work, care for herself, sleep, concentrate, think, communicate, and interact with others in a coherent manner.

20.     Dr. Bryant's conditions, separately and in combination, constituted "disabilities" under the Americans with Disabilities Act and the Rehabilitation Act.  They also constituted serious health conditions under the Family Medical Leave Act.

21.     The nature of Dr. Bryant's illness was for her to experience extended periods of lucidity that were interrupted by episodes of days, weeks, and sometimes months in which her thinking was disorganized and she experienced delusions and intense paranoia.

22.     Between December 2019 and November 2020, Dr. Bryant needed to be hospitalized due to the effects of her mental illness on five separate occasions, at multiple different psychiatric hospitals.

23.     Dr. Bryant's colleagues and supervisors and representatives of OSU's offices of human resources and legal counsel were aware of her struggles with mental illness almost immediately upon the inception of these struggles.

24.     Those colleagues who worked most closely with Dr. Bryant, within and outside her department, noticed that her behavior and demeanor had changed and that she was expressing troubling and potentially delusional thoughts leading up to her first hospitalization.

25.     After Dr. Bryant's first hospitalization in January 2020, her mental health treatment providers determined that she needed to be relieved of her teaching duties temporarily as an accommodation for her disabilities.

26.     On or about January 10, 2020, Dr. Bryant's psychiatrist at Columbus Springs Dublin, a prominent mental health facility near Columbus, Ohio, provided a letter to Dr. Bryant to provide to OSU recommending that she be relieved of teaching responsibilities, and stating that she could return to work for research and service purposes effective January 14, 2020.

27.     Defendant MacDonald conferred with OSU's human resources office.  They agreed to provide Dr. Bryant a release from teaching for the semester.

28.     Other faculty members at OSU-Newark and on OSU's main campus had previously been granted similar accommodations, including some who did not have disabilities of any kind but needed to be released from teaching for personal or professional reasons.

29.     Although Defendant MacDonald and others discussed that the reason for the release from teaching was related to Dr. Bryant's serious mental health conditions, the

University avoided designating the leave as a disability accommodation and did not collect the paperwork that ordinarily accompanied disability accommodation requests at OSU.

30.    During the time of her teaching release, Dr. Bryant did continue to work on her research and service obligations. This continued through the summer of 2020, during which Dr. Bryant had not been scheduled to teach at any point. Dr. Bryant's commitment to her service obligations was exceptional during the summer of 2020 (a period of lucidity during which she did experience active episodes of mental illness), to the point that she was provided additional pay beyond her contract to compensate her.

*Dr. Bryant's Condition Worsens in the Fall of 2020*

31.    As the summer ended, Dr. Bryant began experiencing what ended up being her worst, most extended episode of acute mental illness.

32.    As her condition worsened in late August 2020, Dr. Bryant became aware that she was struggling to remain coherent. As a result, on or about September 1, 2020, shortly after the scheduled start of the fall semester, Dr. Bryant began arranging for an adjunct faculty member to teach in her place and contacted Defendant MacDonald to request that she be allowed to take medical leave, or again be released from teaching as an accommodation for her disability.

33.    Defendant MacDonald informed OSU's human resources office of Dr. Bryant's request, and they opened a new family medical leave file for Dr. Bryant.

34.    Soon after her initial request, Dr. Bryant's condition, which ended up requiring her to be hospitalized involuntarily multiple times in the ensuing weeks, worsened to the point that she became unable to communicate clearly with her supervisors or OSU's human resources staff.

35.     From speaking to close colleagues of Dr. Bryant on the Newark and Columbus campuses, Defendant MacDonald and then-chair of Sociology Dr. Ryan King knew that Dr. Bryant was not communicating clearly and would not be able to make direct requests and respond to direct inquiries, and they conveyed this fact to human resources representatives.

36.     In particular, Dr. Bryant's colleagues attempted to serve as intermediaries to convey Dr. Bryant's accommodation and leave needs to OSU during this period, as OSU's human resources staff was attempting to obtain formal documentation from Dr. Bryant confirming her need for leave.  However, the human resources office decided that Dr. Bryant could submit this documentation only directly, on her own behalf, or through a person she authorized in a direct communication with OSU human resources to communicate on her behalf.

37.     Dr. Bryant was unable to comply with OSU's requests for information.  She received successive emails from OSU human resources imposing deadlines for providing documentation, but because of her mental illness, she interpreted those requests as attacks and threats against her from OSU, and responded with increasing suspicion and anger.

38.     OSU's representatives were aware Dr. Bryant was not responding normally to their requests, and they knew this was not because Dr. Bryant was malingering or consciously avoiding providing information, but because she was not able to think and communicate coherently.

39.     Instead of approving Dr. Bryant's leave based on its actual knowledge of her condition, OSU repeatedly imposed new deadlines for Dr. Bryant to submit paperwork confirming what they already knew.

40.     This response from OSU created a Catch-22:  during episodes of mental illness severe enough to require leave or accommodations, Dr. Bryant was unable to comply with

requests for paperwork confirming her need for leave; and conversely, during periods when she was coherent enough to provide that paperwork, she no longer needed leave or accommodations. Dealing in advance with arrangements for future episodes was, of course, not possible, as there was no way to predict reactions to new medications and treatments until an effective long-term regimen was found.  This pattern is common for individuals struggling with initial diagnoses of bipolar disorder and PTSD.  As a result, Dr. Bryant was unable to meet OSU's conditions for granting her medical leave.

41.     Meanwhile, OSU's repeated demands for paperwork were feeding Dr. Bryant's spiraling paranoia.  Each additional request for paperwork from Dr. Bryant would result in more disorganized and incoherent emails and voicemails.

42.     As this occurred, OSU officials continued to collect more information confirming Dr. Bryant's disability status and need for leave.  For instance, they were aware during the ensuing weeks of autumn 2020 that Dr. Bryant had been "pink slipped" (involuntarily hospitalized on an emergency basis at the request of law enforcement), and they knew Dr. Bryant had an interaction with the police outside her home after throwing personal items and Halloween decorations at passing motorists.  None of this information altered OSU's decision not to grant Dr. Bryant medical leave or other accommodations unless she personally submitted or authorized the submission of formal paperwork.

> *Dr. Bryant Emails and Then Seeks to Rescind a Purported "Resignation," Which  OSU Insists on Taking at Face Value Despite Knowing It Was a Product of Mental Illness.*

43.     On November 9, 2020, Dr. Bryant had a telemedicine appointment (a remote videoconference with her community psychiatrist) in which, according to her provider, "she presented with mania and was unable to focus to navigate the [telemedicine] system due to paranoia and disorganization."

44.     Following this appointment, Dr. Bryant's family learned of this escalation in Dr. Bryant's concerning behavior and initiated a formal process through the probate court to have her involuntarily committed to a mental health facility.  The probate court determined that Dr. Bryant was not capable of caring for herself and posed a threat to herself or others, and ordered that she be committed to the care of OSU's mental health facility, Harding Hospital.  The order was issued November 12, 2020, and she was detained and committed on November 13, 2020.

45.     However, on November 10, 2020, between the appointment that demonstrated Dr. Bryant's increasing lack of competency and the issuance and execution of the court's commitment order, Dr. Bryant emailed an unsigned message to Dr. King, then-chair of her department, stating, "DEAR OSU: Effective today at 10:50 AM, on 11/10/2020 from my WORK COMPUTER....   I resign!  Go fuck yourselves bc you are about to PAY UP!"

46.     For two days after this message, Dr. King did not respond to Dr. Bryant in any way.  He did not attempt to contact Dr. Bryant to be sure she was safe and not harming herself or to double-check that she really intended to give up her tenured faculty position.

47.     When OSU tenured faculty members who are not experiencing mental illness informally indicate their intent to resign or retire from the University, the standard procedure is to provide them with extensive paperwork, which they are asked to personally sign to confirm their intent.  In fact, OSU's own rules state that voluntarily relinquishing tenure requires a "formal" resignation.

48.     In contrast to that practice, and in contrast to OSU's insistence on formal, direct authorization for anyone to provide medical information on her behalf, no such paperwork was forwarded to Dr. Bryant to confirm her intent to resign.

11

49.     Dr. Bryant's supervisors at OSU-Newark and in her department (Defendant MacDonald and Dr. King) were specifically made aware that Dr. Bryant's mental health had further deteriorated and that there was reason to doubt that her stated intent to resign was the product of her increasingly severe mental illness.

50.     Dr. Tiyi Morris, a faculty member on the OSU-Newark campus, had previously been in contact with Defendant MacDonald on Dr. Bryant's behalf.  When she learned that Dr. Bryant had sent the profane email stating that she wanted to resign, she immediately contacted Defendant MacDonald and made sure he knew that Dr. Bryant was not mentally well enough to make such a decision.

51.     Similarly, Dr. Mary Thomas, a faculty member on the Columbus campus, had been informing Dr. King of Dr. Bryant's ongoing mental health crisis, and when she received a copy of Dr. Bryant's email on November 10, 2020, she contacted Dr. King by email and telephone.  In her email, she stated, "I also know that you are aware that [Dr. Bryant] is very ill with mental illness."  She followed up on this email by telephone on November 11, 2020, and had a conversation with Dr. King, who indicated that the response to Dr. Bryant's email was out of his hands and was being handled by the provost's office and OSU's legal counsel.

52.     On November 12, 2020, two days after Dr. Bryant's email, Dr. King replied to her, stating,  "I accept your resignation.  The university's standard protocol is to provide two weeks' notice. As such, your resignation will be effective 11/24/20. The Office of Human Resources will be in touch to discuss next steps."

53.     Dr. Bryant, who had still not been detained pursuant to the court's order, replied to Dr. King's email, "Good because I'm suing OSU for violating my FMLA years ago by making me work while on FMLA (teach classes; Bill MacDonald, that's illegal).   So, I will be

on FMLA indefinitely. Paid! Intermittent FMLA is federal law. Talk to your legal teams! OSU drove violence to my personal community and MY home. How's the football player who was shot in the face? That's on OSU! Period." Dr. Bryant's reference to a football player who had been shot bore no rational connection to the discussion and was self-evidently related to her delusional thought processes during this period.

54.     Contrary to Dr. King's email, there is no standard protocol providing for two weeks' notice for tenured faculty at the university. In fact, the usual notice period departing faculty provide is far longer. Upon information and belief, the reason Dr. King provided a two-week notice period in this instance was because he and others at OSU doubted that Dr. Bryant's stated intent to resign reflected her true intent, believed it was the product of her mental illness, and—at that time—intended to wait for a period of time to see if she regained lucidity before her resignation became final. Dr. King, Defendant MacDonald, and representatives of OSU's human resources officers engaged in discussions to this extent during the ensuing weeks, including asking at various points whether Dr. Bryant had withdrawn or rescinded her resignation.

55.     The following day, November 13, 2020, Dr. Bryant was hospitalized per the court's order. Dr. Thomas, who had received a forwarded copy of Dr. Bryant's November 12 email, followed up with Dr. King, informing him directly of Dr. Bryant's hospitalization and the fact that she would likely remain involuntarily committed for at least 10 days.

56.     On November 15, 2020, Dr. Bryant's parents contacted Defendant MacDonald, Dr. King, and two human resources representatives for OSU. They confirmed the information these individuals had received from Dr. Morris and Dr. Thomas, including the fact of Dr. Bryant's involuntary commitment and the fact that she was not in a mental condition that would allow her to make rational decisions about her employment. They specifically requested that Dr.

Bryant be accommodated under the Americans with Disabilities Act by being placed on leave instead of having her purported resignation accepted.

57.     OSU's decision-makers chose not to honor this request, and discussed the fact that Dr. Bryant—whom they knew at this point had been involuntarily confined to OSU's own mental health facility—had not *personally* asked to rescind her resignation.

58.     By the end of the week following Dr. Bryant's November 10 email, higher level OSU human resources officials, OSU's legal counsel, and representatives of the provost's office had become involved in the process.  These officials instructed that Dr. Bryant's resignation be taken at face value despite all of the information the University had that it was the product of her increasingly severe mental health crisis.

59.     This decision was contrary to the University's usual practice in dealing with faculty resignations, including requiring a signed notice or form, and was made both in spite of these individuals' knowledge of Dr. Bryant's mental health disabilities and because of it—specifically, because the University saw a resignation as the easiest way to cut off its otherwise permanent commitment to honor the tenure of an employee whom they now viewed, based on discriminatory and unsupported stereotypes, as high-risk, alienating, and likely to require continuing, costly accommodations.

60.     The University has also previously allowed employees without mental health disabilities to withdraw their resignations both prior to and after their effective dates.

61.     On November 20, 2020, a social worker at OSU Harding Hospital who was assisting Dr. Bryant contacted OSU's human resources office and asked what they needed to complete Dr. Bryant's still-pending request for medical leave.  This triggered communications to

the higher-level human resources, legal, and provost's office representatives who had instructed that Dr. Bryant be treated as if she had resigned under normal circumstances.

62.     Instead of replying and instructing the social worker so that they could collect the paperwork they had sought for months, OSU's representatives responded by quickly sending a formal denial of Dr. Bryant's FMLA request—the first denial they had ever issued in her case. The stated basis for the denial was that she had not submitted the requested paperwork before emailing her intent to resign.

63.     Upon learning that Dr. Bryant's email was being treated as if it was a real resignation, Dr. Bryant's social worker alerted her and made arrangements for her to have access to her email, which had been withheld from her upon her commitment.

64.     On November 23, 2020, the day before her resignation was designated by OSU to become effective, Dr. Bryant directly emailed Dr. King, providing him the FMLA paperwork that the social worker had prepared and informing him that she did not intend to leave OSU.

65.     Once again, instead of responding right away or attempting to contact Dr. Bryant, Dr. King waited.  A full day later, on the afternoon of November 24, 2020, he informed Dr. Bryant that her request to rescind her resignation was being denied because it had already been accepted.

66.     In immediate response that afternoon, Dr. Bryant made reference to the medical paperwork she had provided to OSU's human resources representative, and stated that her "resignation was due to my complex ptsd," that she was sorry "for the confusion my illness caused," and that she was "not resigning as that was an error in judgment and I am currently hospitalized at OSU receiving significant treatment."

15

67.     Dr. King replied a day later, claiming that since her November 10 email, "we relied upon your resignation and have acted based on it."  This was false; no action was taken in reliance on Dr. Bryant's resignation, and in fact, the ensuing communications show that OSU spent nearly all of the time between the purported resignation and its rescission trying to decide what if anything to do in the expected event that Dr. Bryant regained coherency and withdrew her transparently irrational prior communications.  OSU did not take any steps to fill Dr. Bryant's position during this period, and no other action was taken between November 10 and November 24 that would have prevented OSU from simply acknowledging that Dr. Bryant was not of sound mind at the time of her initial email and that it should not be treated as if it were a formal resignation.

68.     Dr. Bryant subsequently made every effort to exhaust whatever internal avenues of relief were available to her, including providing OSU's legal counsel with documentation from her treating provider demonstrating her lack of competency at the time she sent her November 10 email.  She also asked about an appeal process, but was told none was available because OSU had purportedly not taken any action toward her.

69.     Dr. Bryant nevertheless attempted to use the appeal procedures available when tenured faculty are involuntarily terminated, which involved two University Senate committees: the Committee on Academic Freedom and Responsibility and the Faculty Hearing Committee. Both committees supported Dr. Bryant's appeal, but OSU's leadership refused to cooperate in their investigations and took unprecedented steps to interfere with their issuance of findings, including having the same legal counsel who participated in the decision to exclude Dr. Bryant from her employment direct the University Senate not to allow Dr. Bryant's appeal.

70.     As a result of these decisions, Dr. Bryant's employment at OSU ended effective November 24, 2020, and she continues to be excluded from her tenured position.

71.     The actions described above caused Dr. Bryant great expense, including the denial of her health insurance during a health crisis, harm to her personal and professional reputation, embarrassment, and mental anguish.

72.     The actions of Defendant Ohio State University described above, and the actions of its agents and employees, which were within the scope of their employment, were at all relevant times exercises of authority with malice and/or deliberate indifference toward Dr. Bryant's rights.

## V.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

73.     Following her exclusion from employment, Dr. Bryant filed a timely charge of disability discrimination with the Ohio Civil Rights Commission.

74.     On January 19, 2022, Dr. Bryant received by mail a Notice of Right to Sue (attached as Exhibit 1 hereto) from the U.S. Equal Employment Opportunity Commission.

75.     Dr. Bryant has exhausted all mandatory administrative remedies applicable to her causes of action and has timely filed this action within 90 days of receiving her Notice of Right to Sue for purposes of the Americans with Disabilities Act.

## VI.     CLAIMS FOR RELIEF

76.     The Plaintiff intends this Complaint as a means of pursuing all causes of action permitted under law that are supported by the facts alleged herein and reasonable inferences from those facts, including those specifically stated below.

### A.     Violations of the Rehabilitation Act of 1973

77.     The Plaintiff incorporates the above paragraphs as if fully rewritten herein.

78.     By discriminating against Dr. Bryant based on her disabilities and denying her disability accommodations that she requested and/or that it was otherwise aware she would have requested if she had been capable of doing so, including refusing to grant or even discuss her request to withdraw her informal, unsigned "resignation," Defendant OSU violated Section 504 of the Rehabilitation Act of 1973.

**B.      Violations of the Americans with Disabilities Act of 1990**

79.     The Plaintiff incorporates the above paragraphs as if fully rewritten herein.

80.     By discriminating against Dr. Bryant based on her disabilities and denying her disability accommodations that she requested and/or that the university was otherwise aware she would have requested if she had been capable of doing so, the Ohio State University violated the Americans with Disabilities Act of 1990, which violations the individuals sued here in their official capacities are responsible for and empowered to remedy prospectively.

**C.      Violations of the Family Medical Leave Act**

81.     The Plaintiff incorporates the above paragraphs as if fully rewritten herein.

82.     By denying Dr. Bryant's request for medical leave related to her known serious health condition, resulting in the termination of her employment, the Ohio State University committed unlawful Family Medical Leave Act interference and retaliation, which violations the individuals sued here in their official capacities are responsible for and empowered to remedy prospectively.

## VI.    PRAYER FOR RELIEF

83.    WHEREFORE, the Plaintiff requests the following relief:  (1) declaratory relief establishing the Defendants' violations of Dr. Bryant's rights; (2) a permanent injunction ordering the Defendants to end the exclusion of Dr. Bryant from her employment, reinstate her to her former position with full tenure rights, seniority, and at the level of annual compensation and benefits she would have received prospectively from her reinstatement in the absence of her exclusion from employment, and prohibit them from engaging in further discrimination and unlawful denials of medical leave against her; (3) compensatory damages in an amount to be determined at trial pursuant to the Rehabilitation Act; (4) the costs of this action, including attorneys' fees, as ancillary relief under *ex parte Young* and directly, under the Rehabilitation Act; and (5) such other relief as the Court deems appropriate.

Respectfully Submitted,

/s/Frederick M. Gittes_____
Frederick M. Gittes (0031444)
Trial Counsel
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
(614) 222-4735
Fax: (614) 221-9655
Attorneys for Plaintiff

## JURY DEMAND

The Plaintiff hereby demands a jury of eight (8) to determine all issues triable by jury in this matter.

/s/Frederick M. Gittes_____
Frederick M. Gittes (0031444)